UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| DANIEL C. VANDERPOOL, JR., Plaintiff, | ) | |
| v. | ) | No. 2:24-cv-00045-JPH-MKK |
| FRANK VANIHEL Warden of Wabash Valley Correctional Facility, et al., Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON FEDERAL CLAIMS AND RELINQUISHING JURISDICTION OVER STATE LAW CLAIMS**

Plaintiff Daniel C. Vanderpool, Jr. alleges that officials at Wabash Valley Correctional Facility failed to adequately remediate mold in the facility's dayrooms, which harmed his health. He brings federal claims alleging that the conditions of his confinement violated the Eighth Amendment and state claims alleging that Defendants were negligent. Defendants have moved for summary judgment. Dkt. [71]. For the reasons below, their motion is **GRANTED in part** on Mr. Vanderpool's federal claims, and the Court relinquishes jurisdiction over his state-law claims.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the

record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez,* 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Fed. R. Civ. P. 56(a), the Court views and recites the evidence in the light most

favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572-73.

During the time relevant to this case, Mr. Vanderpool was housed in the M unit and L unit at Wabash Valley. Dkt. 72-8 at 9. Most Defendants worked at Wabash Valley: Frank Vanihel was Warden, dkt. 72-1 at ¶ 3; Mark Payne was Physical Plant Director, dkt. 72-2 at ¶ 3; Jay Hendrix was Safety Hazard Manager, dkt. 72-3 at ¶ 3; Michael Ellis was Litigation Liaison, dkt. 72-4 at ¶ 2; Carla Coakley was Casework Manager from January to June 2022 and was Grievance Supervisor, Policy Manager, and American Correctional Association Coordinator after June 2022, dkt. 72-5 at ¶ 3; and Madison Gilbert worked in the classification department from January 2022 to April 2023 and was a Grievance Specialist after April 2023. Dkt. 72-6 at. 72-6 at ¶ 3. Isaac Randolph was a Grievance Manager for the Indiana Department of Correction from January 1, 2024, through February 2024. Dkt. 72-7 at ¶ 3.

**A. Wabash Valley Ventilation System**

Both the L and M units at Wabash Valley have air ventilation systems in their dayrooms. Dkt. 72-8 at 27. These vents are twenty-five feet in the air, hanging from the ceiling. *Id.* at 37, 53. Mr. Vanderpool testified that both units' ventilation systems had mold at all relevant times due to leaking roofs. *Id.* at 40, 49. This mold was present on the inside and outside of the ventilation systems. *Id.* at 51. Mr. Vanderpool could walk upstairs, within five or six feet from the systems, and see mold on the diffusers and along the ductwork that runs from the attic into the chases on the air handler unit. *Id.* at 51, 53. The

mold appears as black spots and does not resemble dirt. *Id.* at 51, 52. Mr. Vanderpool testified that if one removed the diffuser, mold would be visible inside the system. *Id.* at 52. The ventilation systems have screens that do not grow mold but do collect dirt and dust. *Id.* at 55.

**B. Mr. Vanderpool's Symptoms**

Mr. Vanderpool was housed in the M unit of Wabash Valley. Dkt. 90-8 at 3. He spent time in the dayroom three times per day. Dkt. 72-8 at 42. Around January 2020, Mr. Vanderpool began to experience nausea, vertigo, difficulty concentrating, difficulty sleeping, and some difficulty breathing. *Id.* at 11. Mr. Vanderpool believed he had high blood pressure and believed it may be the cause for his symptoms, and he submitted a healthcare request accordingly on October 25, 2020. Dkt. 90-3 at 1. He was seen by medical staff on October 27, his blood pressure was in the normal range, and he followed medical staff's advice to change his diet. Dkts. 72-8 at 11, 72-10 at 1, 2.

Mr. Vanderpool continued to experience symptoms. *Id.* at 11. Mr. Vanderpool's memory problems became much more pronounced while on COVID-19 lockdown in October 2020. *Id.* at 44. He was seen by medical staff on December 30, 2020. Dkt. 72-10 at 3. He requested an A1C test for diabetes in April 2021, and the results were normal. Dkts. 72-8 at 11-13, 90-3 at 7-12.

Mr. Vanderpool's symptoms persisted for a year-and-a-half or two years and then became more frequent. Dkt. 90-3 at 7-12; dkt. 72-8 at 12-13. He sought medical assistance on October 2, 2021, and his lab results were normal. *Id.*; dkt. 90-3 at 13-20. Mr. Vanderpool was provided a vitamin B-12

supplement, and his symptoms continued. Dkt. 72-8 at 12-13. Mr. Vanderpool did not complain about the mold on M unit dayroom ventilation system to Wabash Valley staff because he had not yet concluded that it affected his health. *Id.* at 40-41.

Mr. Vanderpool moved to L unit at Wabash Valley on January 19, 2022. Dkt. 90-8 at 3. On March 7, 2022, Mr. Vanderpool had an annual health screening where medical staff noted that he appeared disoriented. Dkt. 90-3 at 21-23.

On October 19, 2022, during an appointment with medical staff, Mr. Vanderpool indicated that, for a year, he had felt foggy and nauseated in the morning, which cleared up throughout the day. Dkt. 90-3 at 27. Medical staff noted in their report that he had gotten lab work done in January to resolve his recurrent fatigue issue, and the results were normal and that new lab work would be done. *Id.* at 28, 29. Mr. Vanderpool discussed his fatigue with medical staff again on January 30, 2023. *Id.* at 34-36. Between December 2022 and June 2023, Mr. Vanderpool received additional lab work, tests, and results. *Id.* at 42, 43, 45, 48. Medical staff did not find anything physically wrong with Mr. Vanderpool from these results. *See* dkt. 72-8 at 14, 19-20.

Further medical lab testing occurred on June 20, 2023, and Mr. Vanderpool's vitamin B-12 supplementation order was consequently renewed. Dkt. 72-10 at 75-77. The supplement helped his symptoms some. *Id.* at 78.

On October 27, 2023, Mr. Vanderpool was provided an inhaler for his reports of breathing difficulties. Dkt. 90-3 at 72-75. On October 31, he was

given a chest x-ray and was prescribed a steroid to assist with breathing. *Id.* at 76-78; *see* 72-8 at 15. Generally, in October 2023, medical staff continued to tell him that nothing was physically wrong with him and that his symptoms may instead have an environmental cause. *Id.* at 14, 20. Medical staff did not bring up mold independently, but Mr. Vanderpool asked about it. *Id.* at 14-15. He was informed that mold could contribute to his breathing problems and that medical staff had no authority to address mold problems in the prison. *Id.* This prompted Mr. Vanderpool to begin researching mold. *Id.* at 14.

On November 3, 2023, Mr. Vanderpool's chest was x-rayed, and his "lungs [were] clear[.]" Dkt. 90-3 at 83. On November 27, 2023, he was prescribed a second inhaler. *Id.* at 89-91. His inhalers helped get his breathing under control. Dkt. 72-8 at 16. Further lab results returned as normal. Dkt. 90-3 at 92-94, 103-04.

**C. Defendants' knowledge of mold and their responsive actions**

In "direct response to allegations of mold within the housing units", Wabash Valley contracted with August Mack Environmental, Inc. to conduct a targeted mold assessment. Dkt. 72-1 at 3-8. On April 3, 2022, August Mack completed an assessment of cell blocks 900 and 700, which are not located in the L or M units. Dkt. 72-1 at 3-8; dkt. 72-8 at 38-39. Although the assessment uncovered "minor areas of mold[,]" August Mack found "no significant evidence or signs of building-wide mold-related concerns" in blocks 900 and 700 and found the "minor areas of mold [do] not present a significant

concern to the occupants[.]" *Id.* August Mack did not review the L unit or M unit. *Id.*; dkt. 72-8 at 38-39.

In early summer 2022, Mr. Vanderpool spoke to a non-defendant lieutenant about the mold he observed on the dayroom ventilation system. Dkt. 72-8 at 74.

In August 2022, Warden Vanihel came through L unit for a walkthrough. Dkt. 72-8 at 15, 75. Mr. Vanderpool pointed out the dirty dayroom ventilation system to Warden Vanihel, claiming mold was present. Dkts. 73-8 at 76, 90-4 at 2. Warden Vanihel contacted the zone lieutenant to get the area cleaned. Dkt. 90-4 at 2. When Mr. Vanderpool "made continued complaints of mold", Warden Vanihel continued to check with the zone lieutenant. *Id.*

On June 20, 2023, Mr. Vanderpool wrote a letter to Warden Vanihel indicating that "[t]here is mold growing on the dayroom air vents diffusers. Could this be cleaned?" Dkt. 90-1 at 2. Warden Vanihel responded on June 22 that maintenance was to come in and complete sanitation at the beginning of July. Dkt. 90-1 at 2. Mr. Vanderpool has not designated evidence of further communication with Warden Vanihel after June 2023. *Id.*

At some point, Mr. Vanderpool wrote the fire chief and contacted the zone lieutenant. Dkt. 72-8 at 78; dkt. 90-1 at 1. He also wrote Safety Manager Hendrix in 2023, but did not receive a response. Dkt. 72-8 at 81-82. In June or July 2023, after Mr. Vanderpool had written Safety Manager Hendrix regarding the mold, Mr. Vanderpool observed him in the L unit dayroom, observing and taking photos of the ventilation system. *Id.* at 83-84.

On July 27, 2023, Mr. Vanderpool filed a grievance "ask[ing] for the vent[i]lation system (offender and dayroom) to be cleaned inside and out." Dkt. 90-1 at 3. He referenced his letter to Warden Vanihel, highlighted the mold issue, and indicated that no one had cleaned the system since his letter. *Id.* He cited the "date of incident" to be "ongoing – [June 22, 2023.]" *Id.* His grievance was returned by Grievance Specialist Gilbert because it was untimely. *Id.* at 4.

On August 3, 2023, maintenance staff cleaned the ventilation system and ceiling ductwork in L unit, including the ceiling vent fans. Dkt. 72-2 at ¶¶ 18, 20. This cleaning was prompted by an annual inspection of Wabash Valley and documented deficiencies in the facility. *Id.* at ¶ 15. The ventilation system and ceiling ductwork was similarly cleaned in M unit on the same day. *Id.* at ¶¶ 13, 20. Mr. Vanderpool observed the cleaning in L unit, and Mr. Vanderpool asked one of the workers to change course and clean a moldy spot "real quick." Dkt. 72-8 at 64. Because the spot smeared rather than falling off, Mr. Vanderpool believed it was mold rather than dirt or dust. *Id.* Mr. Vanderpool indicates that the cleaning did not clean the moldy parts of the system, instead focusing on the screens that did not have mold but collected dirt and dust. *Id.* at 80. He did not observe any other attempt to clean the dayroom ventilation system in L unit. *Id.*

Mr. Vanderpool filed another grievance on August 18, 2023, highlighting the same problems with a "date of incident" of "ongoing" and no listed facility. Dkt. 72-6 at 7. His grievance indicated "nothing ha[d yet] been done" to clean

the mold. *Id.* This grievance was returned by Grievance Specialist Gilbert for lack of date and facility location. *Id.* at 6.

On August 26, 2023, Mr. Vanderpool filed another grievance. *See* dkts. 72-6 at ¶ 11, 90-1 at 5. On August 31, 2023, Grievance Specialist Gilbert and Casework Manager Coakley began an investigation. Dkts. 72-5 at ¶ 5, 72-6 at ¶ 13. Among those they e-mailed was Physical Plant Director Payne. Dkts. 72-5 at ¶ 7, 72-6 at ¶ 14. On September 20, 2023, Casework Manager Coakley provided a response to the grievance with Physical Plant Director Payne's response to her that "[m]aintenance did clean the vents in the housing units." Dkts. 72-5 at ¶ 9, 90-1 at 9.

Mr. Vanderpool appealed this grievance response on September 28, 2023. Dkt. 72-9. Litigation Liaison Ellis upheld the underlying disposition. Dkt. 72-4 at 4. He reviewed documents and responses from pertinent staff members to help reach that conclusion. *Id.* at ¶ 17. Grievance Manager Randolph also upheld Casework Manager Coakley's response on October 26, 2023. Dkt. 72-7 at 4. Grievance Manager Randolph reviewed documents and pertinent staff member responses in reaching his conclusion. *Id.* at ¶ 17.

## III.
## Discussion

### A. Eighth Amendment Conditions of Confinement

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-

confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up).

Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

Defendants move for summary judgment, arguing that the mold was not an objectively sufficiently serious condition of confinement and even if it was, they were not deliberately indifferent, but took appropriate responsive action. The Court assumes without deciding that the mold presented an objectively serious danger to Mr. Vanderpool's health.

For the subjective component, the Court evaluates what each Defendant knew about the presence of mold from Mr. Vanderpool's complaints, when they knew it, and whether they "responded reasonably to the risk." *Thomas*, 2 F.4th at 720–21.

It's undisputed that shortly before Mr. Vanderpool's complaints, Warden Vanihel knew of allegations of mold within the housing units. Dkt. 72-1 at 3-8.

Consequently, Wabash Valley contracted with August Mack Environmental, Inc. to conduct a targeted mold assessment in April 2022. While this inspection yielded "no significant evidence or signs of building-wide mold-related concerns," the M and L units were not inspected for mold as part of the assessment. *See* dkt. 72-1 at 3-8.

**1. Warden Vanihel**

In August 2022, Mr. Vanderpool first spoke with Warden Vanihel about mold in the dayrooms. In response, Warden Vanihel alerted the zone lieutenant that the L unit dayroom vent needed to be cleaned. Mr. Vanderpool's next communication with Warden Vanihel about the mold was in June 2023, when he submitted a letter to Warden Vahihel asking that the systems be cleaned. Warden Vanihel responded that he was having maintenance conduct cleaning in early July. This designated evidence shows that Warden Vanihel took action in response to Mr. Vanderpool's complaints about mold. Given the nature and scope of Warden Vanihel's job, the specific actions that he took—directing a subordinate Wabash Valley staff member to remedy the issue—was sufficient and appropriate. *Figgs v. Dawson,* 829 F.3d 895, 903 (7th Cir. 2016) ("Top-level administrators like [the warden] are entitled to relegate to prison staff like [the subordinate prison employee] the primary responsibility for specific prison functions.").

So, from the designated evidence, no jury could find that Warden Vanihel was deliberately indifferent to Mr. Vanderpool's welfare. *See Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) ("A warden is not liable for an isolated failure

of [her] subordinates to carry out prison policies . . . unless the subordinates are acting (or failing to act) on the warden's instructions."); *Thomas v. Blackard*, 2 F.4th 716, 721 (7th Cir. 2021) (prison officials cannot be liable for deliberate indifference when they reasonably respond to an inmate's stated concerns). Warden Vanihel is therefore entitled to summary judgment.

**2. Safety Manager Hendrix**

In June or July 2023, Mr. Vanderpool wrote to Safety Manager Hendrix regarding his concerns about mold. Safety Manager Hendrix did not respond to the letter. Mr. Vanderpool designates evidence that a short time later, he saw Mr. Hendrix "taking pictures of the mold infested area multiple times." Dkt. 91 at 25 ¶ 90; dkt. 90-3 at 31–32 (photographs that Mr. Vanderpool designates as taken by Safety Manager Hendrix). And shortly thereafter, in early August 2023, maintenance staff cleaned the ventilation system, ceiling ductwork, and ceiling ventilation fans in the M and L units. Dkt. 72-2 at ¶¶ 10; 13; 18. From this designated evidence, no reasonable jury could find that Safety Manager Hendrix was deliberately indifferent to any risk presented to Mr. Vanderpool by the presence of mold in the dayrooms. Safety Manager Hendrix is therefore entitled to summary judgment.[1] *See Thomas*, 2 F.4th at 721.

---

[1] Oddly, Defendants state that Warden Vanihel told Mr. Payne *and Mr. Hendrix* to clean the ventilation system, dkt. 93 at 4, while Mr. Hendrix denies that he had "personal involvement in investigating or addressing any mold or sanitation issue regarding L Housing and M Housing Unit vents at any time relevant to Plaintiff's Complaint," dkt. 72-3 at 2 ¶ 7. Regardless, Mr. Vanderpool's admission and designated evidence that Mr. Hendrix "took pictures of the mold infested areas," dkt. 91 at 25 ¶ 90, and Defendants' designated evidence that the moldy areas were cleaned shortly thereafter preclude a reasonable jury from finding that Mr. Hendrix acted with

### 3. Defendants Payne, Gilbert and Coakley

After the August 2023 cleaning, Mr. Vanderpool remained concerned about mold in the ventilation systems. While his August 18 grievance was returned as incomplete, he properly filed a grievance on August 26, stating in part that "nothing ha[d] been done" regarding the ventilation systems. Dkt. 90-1 at 5. Grievance Specialist Gilbert and Casework Manager Coakley investigated, including by emailing Physical Plant Director Payne. Dkts. 72-5 at ¶ 7, 72-6 at ¶ 14. Casework Manager Coakley then responded to Mr. Vanderpool that "[m]aintenance did clean the vents in the housing units," reflecting Physical Plant Director Payne's statement that cleaning had occurred. Dkts. 72-5 at ¶ 9, 90-1 at 9.

Mr. Vanderpool designates no evidence that Grievance Specialist Gilbert, Casework Manager Coakley, or Physical Plant Director Payne believed that the ventilation systems had not been sufficiently cleaned or that the condition of the ventilation systems presented a risk to Mr. Vanderpool. *See Thomas*, 2 F.4th at 721 (no reasonable jury can find deliberate indifference when no designated evidence shows that the defendant was aware of the particular condition at issue).

On the contrary, the designated evidence shows that Mr. Payne directed maintenance staff to clean the vents in the dayrooms and that he knew that the maintenance foreman oversaw cleaning the ventilation system and ductwork in

---

"total unconcern for the prisoner's welfare in the face of serious risks" presented from the mold. *Donald*, 982 F.3d at 458.

the dayrooms. Dkt. 72-2 at ¶¶ 10; 13; 18. Mr. Payne also personally witnessed the ceiling vents in the dayrooms being cleaned and saw the vent fans after they were cleaned, with no mold visible. *Id.* ¶¶ 14; 19-20. Mr. Vanderpool has designated no evidence that would allow a reasonable jury to conclude that Mr. Payne was deliberately indifferent to Mr. Vanderpool's concerns about mold on the fans and ventilation equipment in the dayrooms or that he "lied in his e-mail response." *See* dkt. 91 at 26 ¶ 98. Because Physical Plant Director Payne accurately reported that maintenance had gone to clean the vents, he is entitled to summary judgment. *See Steidl*, 151 F.3d at 741 (a supervisor is not responsible for a subordinate's failure to appropriately carry out instructions).

Because Grievance Specialist Gilbert and Casework Manager Coakley reasonably investigated with Physical Plaint Director Payne and responded to the complaint they received, they too are entitled to summary judgment. *See Figgs*, 829 F.3d at 903 (affirming summary judgment because consulting with the appropriate supervisor and relying on that supervisor's determination was "a reasonable response" to a grievance); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (Under the "division of labor within a prison," a defendant is not deliberately indifferent when he or she receives a complaint and refers it to an appropriate staff member).

**4. Defendants Ellis and Randolph**

Mr. Vanderpool appealed the grievance response, and Litigation Liaison Ellis upheld the underlying disposition. Dkt. 72-4 at 4. He reviewed documents and responses from pertinent staff members to reach that conclusion. *Id.* at ¶

17. Grievance Manager Randolph also upheld the response as the final reviewer after reviewing documents and pertinent staff member responses. Dkt. 72-7 at 3 ¶ 17. Litigation Liaison Ellis and Grievance Manager Randolph both determined that Mr. Vanderpool did not include new information in his appeal requiring a new investigation in addition to what Grievance Specialist Gilbert and Casework Manager Coakley had done. Dkt. 72-4 at 4; dkt. 72-7 at 3. Mr. Vanderpool designates no evidence that either of them understood that he was alleging that while a recent cleaning had occurred, it was insufficient. *See Thomas*, 2 F.4th at 721. And because Litigation Liaison Ellis and Grievance Manager Randolph handled grievance appeals, rather than newly received grievances, it was not typical or feasible for them to conduct a new investigation for each appeal. Dkt. 72-4 at 4; dkt. 72-7 at 3. Litigation Liaison Ellis and Grievance Manager Randolph are therefore entitled to summary judgment. *See Figgs*, 829 F.3d at 903; *Steidl*, 151 F.3d at 741.

* * *

At bottom, Mr. Vanderpool has not designated evidence allowing a reasonable jury to find that any Defendant "refused to take steps" or acted with "something approaching a total unconcern for [Mr. Vanderpool's] welfare in the face of serious risks." *Thomas,* 2 F.4th at 720; *Donald*, 982 F.3d at 458. Instead, the designated evidence shows that no Defendant was directly involved in the cleaning of the ventilation systems, and that each Defendant responded reasonably within the scope of their respective job responsibilities to the issues Mr. Vanderpool raised by about mold in the ventilation systems. *Thomas*, 2

F.4th at 721 (affirming district court's grant of summary judgment in conditions of confinement case where the record showed that the defendant acted reasonably in response to the prisoner's complaint about unsanitary conditions in his cell); *Greeno*, 414 F.3d at 656. While Mr. Vanderpool argues that Defendants should have done more, the responsive actions taken by each Defendant were reasonable under the circumstances and proportionate to the nature of Mr. Vanderpool's complaints. *See Figgs*, 829 F.3d at 904 ("When evaluating [the prison official's] conduct, it is important to consider the substance of [the prisoner's] complaints.").

In short, the designated evidence shows that the alleged shortcomings in any Defendant's response to the cleaning were at most negligent rather than deliberately indifferent. No reasonable jury could find that the designated evidence satisfies the subjective element of Mr. Vanderpool's condition-of-confinement claims, and the motion for summary judgment is **GRANTED** as to these claims.[2]

**B. State Law Negligence**

Because Defendants are entitled to summary judgment on Mr. Vanderpool's federal constitutional claims, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law negligence claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has

[2] Because Defendants are entitled to summary judgment on the subjective element of deliberate indifference, the Court does not address Mr. Vanderpool's argument that he can testify as an expert on mold. Dkt. 19 at 3; dkt. 24.

dismissed all claims over which it has original jurisdiction"); *see Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (citation and internal quotation omitted). In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits."). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the

pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Mr. Vanderpool's state-law negligence claims. The statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. It does not appear that any discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be equally relevant in a state-court proceeding. It is not so clear how the state-law tort claims should be decided here that the court should decide the claims rather than relinquish jurisdiction. Finally, comity favors allowing state courts to decide issues of state law.

The Court therefore exercises its discretion and **relinquishes** supplemental jurisdiction over Mr. Vanderpool's state-law negligence claims against the defendants.

## IV.
## Conclusion

Defendants' motion for summary judgment is **GRANTED in part** as to Mr. Vanderpool's federal claims. Dkt. [71]. The Court relinquishes supplemental

jurisdiction over Mr. Vanderpool's state-law claims, which are dismissed without prejudice. Final judgment will issue by separate entry.

**SO ORDERED.**

Date: 9/4/2026

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

DANIEL C. VANDERPOOL, JR.
123516
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Elijah B. Mollet
Lewis And Wilkins LLP
emollet@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com